OLIVIA WRIGHTSON SWITZ, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. WILLIAM KINGSLEY, ACTING DIRECTOR OF DIVISION OF TAXATION, AND MONMOUTH COUNTY BOARD OF TAXATION, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND TOWNSHIP OF MIDDLETOWN AND WILLIAM C. JOHNSON, DEFENDANTS-RESPONDENTS.

Argued March 19, 1962—Decided June 25, 1962.

568 

 

*Mr. Herbert J. Hannoch* argued the cause for plaintiff-appellant and cross-respondent (*Messrs. Hannoch, Weisman, Myers, Stern & Besser,* attorneys).

Mr. *Alan B. Handler,* Deputy Attorney General, argued the cause for defendants-respondents and cross-appellants (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

Mr. *Arthur D. McTighe* filed a brief on behalf of New Jersey Farm Bureau, *et al., amici curiae.*

The opinion of the court was delivered by

WEINTRAUB, C. J. This case involves the constitutionality of *Chapter* 51 of the *Laws of* 1960, an act relating to the taxation of real and personal property for the use of local government.[1] Plaintiff, a taxpayer, sought a declaration that the statute or portions thereof are unconstitutional. On cross-motions for judgment the trial court held the statute valid except in two respects to which we will later refer. 69 *N. J. Super.* 27 (*Law Div.* 1961). We certified the ensuing ·appeal and cross-appeal before the Appellate Division acted upon them.

## I.

*Chapter* 51 provides that all real property subject to assessment and taxation for local use shall be assessed according to "the same standard of value, which shall be the true value," but that the assessment shall be expressed in terms of the "taxable value." The "taxable value" is defined as that "percentage" of true value which each county board of taxation may establish for the taxing districts within the county (*section* 1; *N. J. S. A.* 54:4–2.25). The percentage must be a multiple of 10 and may be no lower than 20 or higher than 100 (*section* 2; *N. J. S. A.* 54:4–2.26), and the percentage shall be 50 if the county board fails to fix a different one (*section* 3; *N. J. S. A.* 54:4–2.27).

---

[1] The operative effect of *Chapter* 51 has been postponed until the tax year 1964 except as to *section* 13. *L.* 1962, *c.* 20.

## A.

■ *Art.* VIII, § I, *par.* 1 of the *Constitution of* 1947 reads:

"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value; and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district."

Plaintiff assails the provision under which different percentages of true value may be used and urges that only a single, state-wide percentage can satisfy the mandates that (1) property shall be assessed "under general laws and by uniform rules," and (2) real property taxed for local use shall be assessed according to "the same standard of value."

The requirement for "general laws" and "uniform rules" first appeared in the tax clause, *Art.* IV, § VII, *par.* 12, added to the *Constitution .of* 1844 by amendment in 1875. In *Switz v. Middletown Township,* 23 *N. J.* 580, 594 (1957), we said:

"'* * * The direction for the assessment of property 'under general laws, and by uniform rules, according to its true value,' the standard laid down in the 1875 amendment to the 1844 Constitution, 'requires, and is fulfilled by such regulations as should impose the same percentage of its actual value upon all the taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes.' *Stratton v. Collins,* 43 *N. J. L.* 562 (*Sup. Ct.* 1881), Dixon, J. See *State Board of Assessors v. Central R. Co.,* 48 *N. J. L.* 146, 307 (*E. & A.* 1886), Dixon, J."

The *Constitution of* 1947 continued the same basic mandate and to the same end, *i. e.,* equality in the distribution of the burden of government among the owners of taxable real property. The *Constitution of* 1947, however, made certain changes. The one immediately pertinent is the substitution of "the same standard of value" for the term "true value" which the 1875 amendment specified

as the basis for assessment. We shall later refer to pro-
ceedings of the Constitutional Convention of 1947 from
which it plainly appears that "true" value was abandoned
because it was thought to restrict the Legislature to a
single, inescapable concept of "value." The term "the
same standard of value" was designed to permit flexibility
in the approach to the valuation of property. At the same
time, to avoid discriminatory treatment, the *Constitution of
1947* requires that whatever "standard of value" is legis-
lated, that "same" standard shall be applied to all real
property taxable for local government (*i. e.,* municipal,
county, or regional school districts).

Thus equality in the distribution of the burden of local
government upon taxable real property is the basic goal.
The "general" character of the laws and the "uniform"
nature of the rules, as well as the singleness of the "stand-
ard of value," are intended, not as exquisite abstractions of
form, but rather as meaningful limitations to achieve
equality of result. The thought is that things equal to
each other in the context of the local real-property tax
involved shall be treated equally.

*Chapter* 51 meets the constitutional mandates. Under
it, all taxable real property must be valued upon the same
standard or concept of value, *i. e.,* "true value." All taxable
real property within a given municipality and county must
be "assessed" for taxation upon the *same* percentage of
the common standard of value. Thus, all real properties,
subject to the local tax, share equally in the cost of the
local government concerned, whether the assessment ratio
is 20 or 30 or 50 or 90 percent of the common standard.
Although plaintiff argues to the contrary, we think it mathe-
matically certain that the taxpayers of County A are not
affected one whit by the circumstance that the percentage
of true value employed as to them differs from the per-
centage used in County B. Hence we can find no infraction
of the basic principle of equality which the *Constitution*
ordained.

But plaintiff contends that if she is wrong in her claim that the taxpayers within a given county are dealt with unequally in the levy of taxes for local purposes, yet inequality would ensue if a tax were levied upon all real property for *State* purposes, as conceivably the State might some day have to do to meet its obligations under bond issues. The argument assumes that such a State tax would be assessed wholly within the framework of *Chapter* 51, without provision for equalization of the aggregates as among the counties. The short answer is that *Chapter* 51 does not levy a tax for State use, and if the hypothetical tax should hereafter be imposed, such constitutional difficulty as may be involved would beset the statute for the State tax and not *Chapter* 51.

In a somewhat similar vein, plaintiff points out that municipal borrowing capacity is geared to the aggregates of local assessed valuations, *N. J. S.* 40A:2–6, 42, with the result that borrowing capacity will depend upon the percentage of true value which may prevail in the county in which a municipality is situate. Again, the answer is that the difficulty, if there be any, relates, not to *Chapter* 51, but to the statutes that lean upon it.

Finally, inequality is claimed to be inevitable with respect to the veterans' exemption provided by *Art.* VIII, § I, *par.* 3 of the *Constitution.* That provision exempts veterans "from taxation on real and personal property to an aggregate assessed valuation not exceeding five hundred dollars." The argument is that *Chapter* 51 makes the value of the exemption vary with the different percentages of the standard of value used by the counties. This is an inaccurate view of the *Constitution* and *Chapter* 51. The *Constitution* provides that the exemption shall not be "altered." The Legislature can neither enhance nor reduce the worth of the exemption. It cannot, by the use, let us say, of 10% of the standard of value, enlarge the exemption to $5,000, nor by the use of 200%, cut it to $250. If the Legislature provides for taxation on a percentage

other than 100% of value, then the first $500 of value is excluded from the true value of a veteran's property and the remainder is subjected to the percentage which the statute prescribes. Thus if a veteran's property is worth $10,000, the sum of $500 is first deducted, leaving $9,500 to be treated in the same way as the property of a non-veteran. Nothing in *Chapter* 51 speaks to the contrary. Hence the value of the exemption remains constant throughout the State, notwithstanding differences in the percentages as among the several counties.

### B.

Plaintiff claims support in the proceedings of the Constitutional Convention of 1947 (*Vol.* I, *pp.* 767–85, 833–42). We do not believe any of the delegates talked about the issue now before us. Basically, two thoughts were there explored. One, as we have already said, was that the existing requirement for "true" value was too restrictive and as well the source of inequities because of varying local views as to what constitutes "true" value. The critics believed the Legislature should be free to select another standard of valuation. The other subject was the power to classify real property, there being specific references to the Railroad Tax Law of 1941 (*c.* 291), *N. J. S. A.* 54:29A–1 *et seq.*, under which railroad property was taxed for local purposes at a fixed rate of $3. It was agreed that such classification of real property was barred by the provision the Convention adopted, although some felt strongly that the Legislature should have a free hand.

In the course of the discussion, Mr. Cavicchia, a delegate, raised the question whether the proposed tax clause called for "a uniform state-wide *standard of value* as fixed by the Legislature or whether it permits of varying *standards of value* among the taxing districts" (*p.* 782; italics added), whereupon Mr. Van Alstyne expressed his view that the provision for "uniform rules" would require the same

standard of value throughout (*p.* 782). Later the subject again arose in the discussion of a change which had been made to meet the objection of Mr. Cavicchia in which Mr. Clapp had joined. It was explained that their criticism

"* * * stemmed from their fear that the original language would give autonomy to the respective taxing districts so far as the *standard of value* which was to regulate the assessment of property was concerned, and that in districts in which second-class railroad property might be found, such as Paterson, Elizabeth, Jersey City, Weehawken, West New York, etc., you might find different *standards of value* being set up by which the assessment of such property was to be made. To remove any doubt as to the limitation, so that there would be uniformity throughout the various taxing districts in which second-class railroad property may be found, and to insure that the same *standard of value* would be applied in all of those respective taxing districts, this change was made." (*p.* 836; italics added)

Thus the discussion did not relate to the problem before us. Rather the subject was equality in the distribution of the cost of local government, and to that end it was decided that the standard of value, *i. e.,* the *basis* upon which the value of taxable property is determined, should be the same throughout. No one had in mind the question whether different *percentages* of the *same standard of value* might be used in different counties where such use would not lead to inequality in the sharing of the burden. The stress throughout upon the theme of equality is evident from the "Summary and Address to the People of New Jersey by the Constitutional Convention of 1947," the delegates' report to the people, adopted by the Convention "to present the basic facts about the proposed new State Constitution," which contains (*Vol.* II, *p.* 1322):

*"The Old 'True Value' Standard for Assessment is Dropped*
This provision of the old Constitution has been strongly criticized because of the variability in its interpretation by the local assessors. The clause requiring assessment 'under general laws and by uniform rules' has been retained because it assures equality of treatment of taxpayers and permits legislative flexibility.

Under the new tax clause it will be necessary to revise the present law which taxes second-class railroad property at a special rate lower than the general local property rates. 'All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value; and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.'

The control of taxation by the Legislature is continued."

Indeed, the question whether assessments should be made on a *percentage* of full value did not emerge until some time after the Constitutional Convention. The question was generated by litigation, culminating in *Switz, supra,* 23 *N. J.* 580, decided in 1957, wherein it was held that *mandamus* would lie to compel local assessors to obey the *statutory* mandate for assessment at *full* true value. That holding, made ten years after the *Constitution of* 1947 was adopted, focused attention upon sundry collateral problems which would arise upon the use of *full* true value. See concurring opinion in *Switz,* 23 *N. J.,* at *p.* 599. Assessors had used percentages of true value and the percentages so used, usually well below 100%, varied tremendously. There was also intra-municipal inequality because different percentages were used with respect to different classes of real property, but the holding in *Switz* went beyond that problem of internal inequality, for it held that equality must be achieved at the level the Legislature had commanded, *i. e., full* true value. There followed much public debate upon the question whether the Legislature should fix a percentage of full value close to existing local practices, to minimize repercussions which were feared.

That question was explored in the *Ninth Report of the Commission on State Tax Policy* (1958), which recommended the program that became, with certain modifications, the basis of *Chapter* 51. The *Ninth Report* said (*p.* 69):

*"Tax Rate Decline*

A decline in the tax rate commensurate with the increase in the tax base which would follow 100 per cent assessments is the other

major effect which should follow such a change. The average State rate would have been $2.05 instead of $8.30 in 1957. It has been earnestly contended that such a decline in the tax rate is purely theoretical in that there would be a tendency to encourage a spending spree because taxpayers are accustomed to the present higher tax rates. To the contrary, taxpayers appear to attach significance only to the *amount* of tax payable as shown on their tax bills, and few taxpayers are able to state the tax rate of the community in which they live.

This Commission does not concur in the view that a more realistic tax base would produce unrealistic local budgets. Nevertheless, the apprehension among taxpayers who associate the phrase, increased assessments, with increased taxes, rather than with a reduced tax rate, must be recognized as real and widespread. The commitments of both political parties are equally plain. For these reasons alone, a fractional standard of value would be more acceptable than 100 per cent assessments. Under such a standard, real property would be uniformly assessed at a certain stated percentage of its full value, as prescribed by law."

## Further (*p.* 97):

"So far as the taxpayer is concerned, assessments at a fraction of full value will make no difference in his tax liability. It would cause no greater shift in the tax burden among classes or among individuals regardless of what the present differences may be. He will pay the same under 100 per cent, 60 per cent, 40 per cent, or 10 per cent assessments—provided local budget requirements remain unchanged. It will, however, make a difference in the tax rate. If a uniform assessment requires that the local average ratio of assesesd value to true value be lowered, the tax rate will increase; conversely, assessments at a higher local ratio would cause the tax rate to decrease.

For psychological reasons, it seems best to adopt a fractional valuation. This valuation must be selected so as to bring a minimum disturbance to conventional tax rates. No matter what uniform fractional valuation is used, however, some tax rate adjustments will be large, but this need not change the tax bill received by any taxpayer. Shifts of tax burden among taxpayers in the same class and among classes of taxpayers will occur—but only because of the establishment of uniform treatment, not because of the fraction selected."

## Finally the Commission recommended (*p.* 100):

"In view of the wide public reluctance to accept 100% assessments, and despite the fact that there is no real difference between

the two in the distribution of the tax burden, a uniform Statewide assessment ratio for real estate should be established at 40% of the full valuation."

Thus the *Ninth Report* recommended a fraction of true value for the reasons indicated. The Legislature simply went one step further. Presumably for the very reasons given in the *Ninth Report,* the Legislature concluded the popular disturbance would be still less if each county used a fraction of true value consonant with existing local practices, and to that end it empowered the county boards of taxation to select from among the percentages permitted by *Chapter* 51.

Plaintiff stresses *Assembly Concurrent Resolution No.* 36 (filed July 17, 1956), adopted while the *Switz* case was pending. Doubtless, the resolution was precipitated by the spectre of enforcement of the statutory mandate for assessment at *full* true value and the feared collateral repercussions we have mentioned. The resolution proposed to amend the tax clause of the *Constitution* by adding to it:

"* * * The Legislature may authorize the governing body of any municipality constituting a taxing district to establish a proportion of the standard of value at which real property situate therein shall be assessed, and such proportion shall be uniformly applied to all such real property within the taxing district."

The proposal was defeated at the polls in November 1956.

Plaintiff says *Assembly Concurrent Resolution No.* 36 reveals a legislative understanding that the *Constitution* required a *single percentage* of the standard of value throughout the State. We of course accord respectful consideration to the constitutional opinion of a coordinate branch of government, albeit we may not default in our duty to arrive at an independent determination. But at best the resolution can merely evidence doubt as to meaning of the tax clause. Indeed, we cannot be sure wherein the doubt reposed, since we are not certain we grasp the purpose of *Assembly Concurrent Resolution No.* 36. If it

meant to authorize a municipal determination of a percentage, binding for the purpose of a county or State tax without equalization of aggregates within the area affected by the tax, then of course an amendment would be necessary. If, on the other hand, the resolution contemplated municipally-determined percentages, subject however to appropriate equalization if the tax is for other than the municipality's use, then the resolution merely reflected someone's doubt that varying percentages plus equalization would meet the constitutional mandate. But the final answer to reliance upon *Assembly Concurrent Resolution No.* 36 is that if perchance it reflects the view for which plaintiff contends, yet *Chapter* 51 reflects a legislative view to the contrary, and of course we cannot follow both.

## C.

The use of different percentages is assailed upon still other grounds.

Plaintiff says the statute is a local law violative of *Art.* IV, § VII, *par.* 9 of the *Constitution* which reads:

"The Legislature shall not pass any private, special or local laws:

* * * * * * * *

(6) Relating to taxation or exemption therefrom.

* * * * * * * *

The Legislature shall pass general laws providing for the cases enumerated in this paragraph * * *."

The argument runs that *Chapter* 51 would be a "local" law if it directly legislated a different percentage for each of the counties, and that the Legislature cannot do indirectly what it cannot do directly. It is, however, well settled that the *Constitution* does not deny the Legislature the serviceable power to permit local decisions under a general law, at least when there is a rational basis to provide for a choice. Recently in *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199, 230–232 (1960), we upheld

a statute committing to the electorate of each county the question whether the statute's prohibition against Sunday selling should have operative effect in such county. In the case of *Chapter* 51, the Legislature simply decided, as it reasonably could, that collateral repercussions would best be minimized by permitting each county board of taxation to select a percentage in the light of the board's special familiarity with its own scene. Indeed here the choice given the county boards has no actual effect upon the operative provisions of *Chapter* 51, since, as we have already shown, there is no impact whatever upon the dollar amount of the tax.

Next, plaintiff contends the choice, if one may be permitted, must be made by the local electorate rather than by the county board. Plaintiff relies upon the much-differentiated case of *Attorney General v. McGuinness,* 78 *N. J. L.* 346 (*E. & A.* 1910). That case involved a civil-service law which was to be operative in each municipality upon local acceptance. The court viewed the act (1) to be incomplete until local acceptance and (2) to be in essence a supplement to the municipal charter, and upon that appraisal, held the choice must be given to the voters of the municipality and not to its governing body. Whether the decision was sound upon its own facts, we need not say. *Chapter* 51 is operative throughout the State without local acceptance and in no sense amends or supplements the municipal charter. See *Bucino v. Malone,* 12 *N. J.* 330, 340 (1953); *Schinck v. Board of Education,* 60 *N. J. Super.* 448, 458 (*App. Div.* 1960).

Nor is there any reason why the Legislature may not select the county board of taxation to make the choice. After all, the county board, no less than a municipality or county, is ultimately an agency of the State. The Legislature may decide which of the agencies it creates is best able to execute its will. It is thoroughly reasonable to utilize the county board, an agency which, because of its wide role in the area of local taxation, can well make an

informed and objective choice of a percentage. No constitutional restriction stands in the way.

Finally, plaintiff urges *Chapter* 51 fails to provide a standard to govern the county board in its choice of a percentage. The constitutional doctrine sought to be invoked is that if the Legislature delegates authority to prescribe rules to achieve the legislative purpose, the statute must expressly or impliedly reveal a standard for the exercise of the discretion delegated. *In re Berardi,* 23 *N. J.* 485 (1957); *Ward v. Scott,* 11 *N. J.* 117 (1952); *Jamouneau v. Local Government Board,* 6 *N. J.* 281, 287 (1951); *Van Riper v. Traffic Tel. Workers Federation,* 2 *N. J.* 335, 353 (1949).

The requirement for a standard relates to the delegation of legislative power. A standard is needed to the end that what is done under the delegation shall not exceed or depart from the intent of the Legislature. In the familiar words of Mr. Justice Cardozo, the discretion may not be "unconfined and vagrant"; it must be "canalized within banks that keep it from overflowing." *Panama Ref. Co. v. Ryan,* 293 *U. S.* 388, 440, 55 *S. Ct.* 241, 256, 79 *L. Ed.* 446, 469 (1935) (dissenting opinion). Here, however, there is no delegation of legislative power. The legislative expression is complete and precise. *Chapter* 51 prescribes all the essentials of the tax to be imposed. See *Township of Bernards v. Allen,* 61 *N. J. L.* 228, 238 (*E. & A.* 1897); *Van Cleve v. Passaic Valley Sewerage Com'rs,* 71 *N. J. L.* 574, 581 (*E. & A.* 1905). The choice committed to the county board relates to a matter of mechanics. The Legislature created a number of specific channels, and finding that all will lead to the same objective, it authorized the county board to choose from among them. The Constitution does not require the prescription of a standard for a choice under a statute which fully exercises the legislative power.

## II.

*Chapter* 51 contains two provisions favorable to agricultural interests, one relating to real property and the other to personalty. Both were held invalid by the trial court.

As to real property, *section* 23 (*N. J. S. A.* 54:4–1) provides:

"* * * In the assessment of acreage which is actively devoted to agricultural use, such value [taxable value] shall not be deemed to include prospective value for subdivisions or nonagricultural use."

As to personalty, *section* 8 (*N. J. S. A.* 54:4–11) treats farm machinery and livestock more favorably than machinery and equipment used in other businesses.

## A.

It is necessary to sketch the history of the adoption of the tax clause in 1875 and the interpretation later placed upon it.

The *Constitution of* 1844 had no specific restraint upon the taxing power. The 1875 amendment had its genesis in the tax treatment of railroad property. Initially railroads were incorporated by special acts of legislation which generally provided for a modest tax for State use and for exemption from any other property taxation. Those provisions were designed to aid an infant industry of public concern. In time, the tax burden upon other property soared, and the railroads having prospered and vastly extended their holdings, the exemption from local taxation led to popular demand that railroads contribute equitably to the cost of local government. See opinion of Mr. Justice Parker in *State Board of Assessors v. Central R. R. Co.*, 48 *N. J. L.* 146, 294 (*E. & A.* 1886). A serious obstacle stood in the way; some of the charters of incorporation had been held to be irrepealable contracts, immunizing the railroads from

additional taxation. *New Jersey v. Yard,* 95 *U. S.* 104, 24 *L. Ed.* 352 (1877); *State Board of Assessors v. Morris & Essex R. R. Co.,* 49 *N. J. L.* 193, 198 (*E. & A.* 1886). Ultimately the roads holding irrepealable contracts were induced to relinquish their immunity, and they, as well as the railroads whose charters were amendable, were then subjected to local taxation. This result was achieved in 1873, the same year in which there was created the Constitutional Commission which proposed the tax clause adopted in 1875. See, generally, *Conford, The Tax Clause in the Revised Constitution* (presented to the Committee of Taxation and Finance of the Constitutional Convention, July 1, 1947), *pp.* 14–21. There can be no doubt that the tax clause was provoked by the experience with railroads which we have recounted.

The precise meaning of the amendment of 1875 never became fully settled. In general, it was accepted that the purpose was to assure equality in the distribution of the burden of government. The *ad valorem* taxation of property was regarded as a thing apart from other taxation. The requirement for "general laws" respecting taxation of property did not admit of the wide power of classification which in time was recognized to be valid with respect to other kinds of taxation. In short, the restraint of the tax clause upon the power to classify property for taxation was decidedly greater than the restraint found in the constitutional provisions for equal protection of the laws and due process of law.

Our cases long adhered to the thesis that an exemption was justifiable only if the property was used for a purpose which was essentially public and not private, as "a *quid pro quo* for the performance of a service essentially public, and which the State thereby is relieved *pro tanto* from the necessity of performing." See *Rutgers Chapter of the Delta Upsilon Fraternity v. City of New Brunswick,* 129 *N. J. L.* 238, 240 (*Sup. Ct.* 1942), affirmed on opinion below, 130 *N. J. L.* 216 (*E. & A.* 1943).

A few years before the Constitutional Convention of 1947, two notable departures from that interpretation were made. One occurred almost simultaneously with the decision in *Rutgers Chapter,* just cited. *Schwartz v. Essex County Board of Taxation,* 129 *N. J. L.* 129 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 177 (*E. & A.* 1943), sustained a statute exempting personal property stored in public warehouses, the court holding that an exemption could be granted to enable such warehouses to compete with like operations in neighboring States. The other departure came in *Jersey City v. State Board of Tax Appeals,* 133 *N. J. L.* 202 (*Sup. Ct.* 1945), modified *sub nom. Jersey City v. Kelly,* 134 *N. J. L.* 239 (*E. & A.* 1946), where the Railroad Tax Law of 1941 (*c.* 291) was upheld notwithstanding that it imposed a tax on railroad real property for local use at a flat rate of $3 per $100.

With this background, we turn to the provisions of the *Constitution of* 1947.

We need not decide the meaning of the exemption provision of *Art.* VIII, § I, *par.* 2, in relation to real property. It is enough to note that with respect to real property made taxable by statute for local purposes, *Art.* VIII, § I, *par.* 1, quoted above, explicitly forbids preferential treatment. It expressly requires that all real property assessed and taxed locally or by the State for allotment and payment to taxing districts "shall be assessed according to the *same* standard of value" and "shall be taxed *at the general tax rate* of the taxing district in which the property is situated, for the use of such taxing district." Thus the *Constitution* forbids the tax preference upheld in *Jersey City, supra,* under the tax clause of 1875. We have already referred to the proceedings of the Constitutional Convention which plainly reveal that purpose. Indeed the Convention memorialized the Legislature to enact a new railroad tax law. See *Third Report of the Commission on State Tax Policy* (1948), *p.* 1; *p.* 27. The Railroad Tax Act of 1941 was accordingly superseded by another statute under which rail-

road property taxable for local use is taxable at the local rate. *L.* 1948, *c.* 40, §§ 10, 13; *N. J. S. A.* 54:29A–19, 24.

*Art.* VIII, § I, *par.* 1, however, imposes no such limitation upon the treatment of personal property. The mandate for sameness in standard of value and tax rate is limited to real property. It is significant that although the Constitutional Convention proposed a tax clause phrased to overturn the *Jersey City* case as to real property, it made no effort, as to personalty, to disagree with the concept of classification embraced in *Schwartz.* We think it clear the intent was to leave in the Legislature a broad power to classify personal property for either exemption or preferential treatment. We have heretofore so viewed the *Constitution. General Electric Co. v. City of Passaic,* 28 *N. J.* 499 (1958), appeal dismissed 359 *U. S.* 1006, 79 *S. Ct.* 1146, 3 *L. Ed. 2d* 987 (1959).

B.

From the foregoing, the validity of the agricultural provisions of *Chapter* 51 is readily determined.

■ The provision of *section* 23 that in the assessment of acreage actively devoted to agricultural use, the taxable value "shall not be deemed to include prospective value for subdivisions or nonagricultural use," is plainly invalid. We need not delay to consider the suggestion that this provision creates but a "rebuttable" presumption or that the Legislature had in mind only such "prospective value" as could not be considered in any event. However the provision may be viewed, it is inescapable that the Legislature intended some impact upon the "standard of value" favorable to this class of real property. *Art.* VIII, § I, *par.* 1, plainly requires the application of the *same* standard of value and the *same* rate of tax, to all real property taxable for local use. Hence we agree with the trial court that the quoted provision of *section* 23 is invalid.

We agree also that the invalidity of this provision does not imperil the entire act. Surely we cannot hold the

Legislature would not have adopted *Chapter* 51 without it. *Angermeier v. Borough of Sea Girt*, 27 *N. J.* 298, 311 (1958) ; *S & L Associates, Inc. v. Washington Township*, 35 *N. J.* 224, 229 (1961). Indeed *section* 36 (*N. J. S. A.* 54:4–2.32) tells us that "if any clause, sentence, paragraph, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder thereof." The invalidity here is well within the Legislature's expression of severability.

██ We cannot, however, agree with the trial court's view that the preferential treatment of agricultural machinery and livestock is unconstitutional. The Legislature, as we have said, has broad discretion in the classification of personal property for exemption or preferential treatment. We must uphold the classification if any set of facts can reasonably be conceived to support it. *New Jersey Restaurant Ass'n v. Holderman*, 24 *N. J.* 295, 301 (1957) ; *Two Guys from Harrison, Inc. v. Furman*, *supra*, 32 *N. J.*, at *p.* 228. We must assume the Legislature reasonably found the farmers need this assistance and the total interests of the public will be furthered by it.

### III.

The remaining provisions under attack relate to the taxation or exemption of tangible personal property.

Tangibles are placed in three broad categories: (1) tangible household personal property and personal effects; (2) tangibles "used in business"; and (3) tangibles which are *not* used in business and are other than household property and personal effects.

### A.

██ *Section* 8 (*N. J. S. A.* 54:4–11) provides for assessment of business tangibles on the basis of "the common level" in the taxing district. Plaintiff contends that the

Legislature thereby "authorized" each local assessor to select any percentage of value at his uncontrolled will, thus enabling the assessor to decide how much of the burden of local government shall be visited upon business tangibles or classes thereof. This is a mistaken view of *section* 8.

*Section* 8 requires that certain business tangibles be assessed at the same percentage which applies to real property and that other business tangibles be assessed at stated portions of that percentage. *Section* 8 could have been more happily phrased, but when the section is read in the light of the history of the taxation, it becomes clear that the Legislature did not "authorize" assessors to depart from the basis we have stated, but rather, by its reference to a "common level," simply built into *section* 8 a preventive remedy to protect business tangibles from unauthorized discrimination vis-a-vis real property.

Section 8 defines the common level as "the unweighted average ratio of assessed to true value of real property in the taxing district determined by the Director of the Division of Taxation * * * from data compiled for the purposes of chapter 86, Laws of 1954 (N. J. S. A. 54:1–35.1 et seq.)." The statute referred to calls upon the Director to find the average ratio of the assessment of real property in each taxing district and to bring the aggregates of the ratables to 100%, the resulting figures then constituting the basis for the distribution of State school aid. The backdrop of the statute was the widespread failure or refusal of local assessors to assess at *full* true value, one consequence of which was disproportionate distribution of that school aid.

The failure of assessors to assess all real property at full or any single percentage of true value led also to intra-municipal inequality. In a series of cases it became settled that a taxpayer who was visited with more than his correct share of the load was entitled to have his assessment reduced to the "common level" of assessments in his taxing

district. The practical problem was how to prove a "common level." We ultimately held that in given circumstances the Director's average ratio could evidence the "common level" to which a discriminatory assessment should be reduced. *In re Kents, 2124 Atlantic Ave., Inc.*, 34 *N. J.* 21 (1961).

*Chapter* 51 was adopted before *Kents* was decided. Business interests feared that local assessors would adhere to the stated percentage as to business tangibles while assessing real property below it. The knotty problem of how to prove a "common level" of assessment of real property in a proceeding for relief from unequal assessment of business tangibles was very much in mind. The need for some practical remedy was apparent. The Legislature decided to use the Director's average ratio. Having made that decision, the Legislature could have provided for post-assessment relief, but, presumably because of the practical hardship involved in individual appeals, the Legislature simply decided upon a preventive remedy, *i. e.*, by providing that if the Director's tables revealed a "common level" of assessment of real property *below* the specified percentage, then business tangibles shall be assessed at that common level. That the Legislature intended the "common level" to have that role is evident from the proviso in *section* 8 that "such common level shall not exceed the percentage level, in effect in the tax year, for expressing the taxable value of real property in the county."

Chapter 51 directs the assessment of real property at the fixed percentage, and the assessor's duty to do so remains enforceable by *mandamus*. *Switz, supra,* 23 *N. J.* 580; *Ridgefield Park v. Bergen County Board of Taxation,* 31 *N. J.* 420 (1960), appeal dismissed 365 *U. S.* 648, 81 *S. Ct.* 834, 5 *L. Ed. 2d* 857 (1961). If that duty is met, the "common level" and the fixed percentage will be one and the same. In providing a preventive, *Kents*-type remedy, *section* 8 did not dilute in the least the assessor's duty to assess both real property and business tangibles

on the basis of the fixed percentage. Hence, far from authorizing unequal treatment, *section* 8 provides an antidote against it.

The use of the "common level" for business tangibles necessarily assures *intra*-municipal equality within that class as well as equality between that class and real property. It is suggested that *inter*-municipal inequality may ensue. As to this, we agree with the trial court that if the "common level" deviates from the percentage fixed for real property and if *inter*-municipal inequality as to the cost of county or school government would result, an appropriate adjustment must be made in the equalization tables under *sections* 19 to 21 of *Chapter* 51 (*N. J. S. A.* 54:3–17 to 19). Equalization may not achieve perfection, but practical equality is all that can be expected in the area of taxation, and so long as the Legislature does not authorize a scheme calculated to induce inequality, there is no constitutional infirmity.

### B.

Plaintiff assails the classifications among business tangibles made by *section* 8. We have already pointed out that the legislative power to classify personal property is an ample one. Nothing before us overcomes the presumption that the Legislature had a rational basis to differentiate among these tangibles to a proper end. The Legislature could find differences among the classes of tangibles and conclude that both fairness and administrative feasibility justify the treatment accorded them.

### IV.

The final question is whether *Chapter* 51 is invalid in its treatment of tangible household personal property and personal effects. Plaintiff acknowledges the undeniable fact that the assessment of such property is extremely difficult. It presents administrative problems which could well

induce the view that the fruits of the tax do not warrant the effort involved. Surely to make an actual valuation of all such property would be impossible in terms of time and cost. With these preliminary observations, we turn to the specific challenges.

A.

 *Section* 13(a) (*N. J. S. A.* 54:4–9.2(a)) provides for taxation of these tangibles "for local use unless the governing body of the municipality within which the same is located shall determine, by ordinance, not to tax the same."

(We note parenthetically that to avoid inter-municipal inequality, the assessments of these tangibles are not included in the equalization table in *section* 19 (*N. J. S. A.* 54:3–17)' so that they play no part in the allocation of the cost of county government; and *section* 13(a) excludes them from the "apportionment valuation" in *N. J. S. A.* 54:4–49 used in the distribution of the cost of school districts.)

Plaintiff concedes the Legislature may exempt such property, but contends the statute must do so throughout the State. This challenge is essentially the same claim of a "local law" which we discussed earlier in another connection. We see no reason why the Legislature may not leave to local decision the question whether a tax shall be levied for the needs of that locality. The Legislature may by general law authorize municipalities to levy a tax for their own needs, 1 *Cooley, Taxation* (*4th ed.* 1924), § 75, *p.* 187, and to grant exemptions therefrom, 16 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 44.65, *p.* 172. We find no constitutional difference in a general law under which the municipality may decline a tax which otherwise would be imposed for its exclusive use.

Nor, for the reasons already given, do we find any constitutional mandate that the decision be left to the voters

of the municipality rather than its governing body. Plaintiff here relies again upon *McGuinness, supra,* 78 *N. J. L.* 346, which, as we have said, required voters' acceptance of a statute which it deemed to be incomplete until local acceptance and to be in effect a supplement to the municipal charter. The power to levy such a tax could surely be delegated to the governing body itself, 1 *Cooley, Taxation* (*4th ed.* 1924), § 75, *p.* 187; we see no reason why the option to reject cannot be placed with it.

Plaintiff complains of the lack of a "standard" for municipal rejection of the tax. We have already pointed out that standards are required only with respect to the exercise of delegated legislative power. Here the Legislature fully exercised the legislative power. The statute simply gives an option to the governing body. In this respect it is no different from legislation authorizing a municipality to create a planning board, *N. J. S. A.* 40:55–1.4, or an incinerator authority, *N. J. S. A.* 40:66A–4(a), or a parking authority, *N. J. S. A.* 40:11A–4, or to establish a municipal court, *N. J. S.* 2A:8–1. No standard is constitutionally required. Indeed it is difficult to think of one which would be anything but a meaningless generality.

## B.

The remaining objection relates to the assessment for taxation of these tangibles if the municipality should not exempt them. *Section* 13(a) provides for an assessment upon that percentage of "fair value" as shall be fixed with respect to real property. "Fair value" of the tangible household personal property "shall be the value thereof for each household if offered for sale as a single lot." The owner may file proof of that value. *Section* 13(b) continues:

"* * * In the absence of such proof, or of other proof, the assessor may assess the same by estimating the fair value thereof in

terms of an average value per room, taking into account the size of the household, the general economic level of the neighborhood in which it is located, and such other relevant factors as will assist him in arriving at a fair, equitable and practicable valuation; but any such assessment shall be made according to standards and practices set forth in uniform rules and regulations promulgated by the Director of the Division of Taxation."

Plaintiff assails the stated basis for valuation as vague and capricious. The legislative aim is clear enough. Recognizing the practical impossibility of doing anything more, the Legislature provided that, in the absence of other proof, the valuation shall be made on the assumption that each room of a house has tangibles of equal value; that overall the size of the house bears upon that average value, as also does the general economic level of the neighborhood. One may easily dwell upon one of the factors until it seems devoid of guidance, but in their totality, they suffice. The Legislature could properly find that the administrative problem requires and indeed permits only a simple, mechanical approach to valuation of these tangibles. To that end the factors specified are appropriate enough, as is also the legislative decision to call upon the expertise of the Director, for the specifications of "other relevant factors" and rules and regulations which, together with the specific factors, will lead to "a fair, equitable and practicable valuation." Perhaps a better standard could be devised. Plaintiff does not suggest one, and none occurs to us. *Cf. Elizabeth Fed. S. & L. Ass'n v. Howell,* 30 *N. J.* 190, 194 (1959). We cannot strike down a standard the Legislature selects unless its constitutional insufficiency is plain.

C.

Finally plaintiff challenges so much of *section* 13 as provides that these tangibles shall be taxed at the general rate of the taxing district for the year *preceding* the year in which the tax is payable. Since other tangibles are taxed at the general rate for the year in which the tax is

payable, there is a disparity in the treatment of this class of tangibles. But the tax clause does not require that all *personal* property be taxed at the *same* rate. The tax clause so requires only as to *real* property. Hence if household tangibles constitute a rational class for taxation, and we cannot quarrel with the legislative judgment that they do, all the *Constitution* demands is equality within the class. This, *section* 13 does provide.

In conclusion, we find that the judgment is correct, except insofar as it declares invalid the preferential treatment of farm machinery and livestock. In that respect the judgment is modified, and as so modified, it is affirmed.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.