HOPKINS, J. T. C.
This matter is on remand from the Appellate Division with instructions for further hearing and a determination relating solely to the added assessment for the tax year 1973.
*334 The sole issue before this court is whether the added assessment set out in the judgment of the Bergen County Board of Taxation was correct or, on a finding that it was not, the appropriate added assessment, if any.
The subject property, which was then under construction, was partially assessed on October 1, 1972, for the tax year 1973, as follows:
Land $ 2,503,800
Building 14,705,000
Total $17,208,800
Since the construction was substantially completed in February 1973, it was the subject of an added assessment as of March 1,1973. The added assessment was in the amount of $4,079,167, which was predicated on a 10-month period. The Bergen County Board of Taxation reduced the added assessment to $2,416,-570.
The property, consisting of 4.871 acres, is improved with a 31-story and penthouse apartment containing 484 apartments and 8 offices, as well as a separate garage with a capacity for 650 cars. It was built in 1972 and 1973, being substantially completed in February 1973. It has been described aS the most prestigious high-rise luxury apartment building in Fort Lee, with a prime location commanding a stunning view of the Hudson River and the New York City skyline. The details of its elaborate construction were previously described in the opinion of the Division of Tax Appeals.
As of March 1, 1973 the property was subject to a consolidated, nonrecourse mortgage in favor of Metropolitan Life Insurance Company in the amount of $21,250,000, of which $18,600,-000 had been advanced. Of the balance to be loaned, approximately $150,000 was in escrow pending completion of some work on the building, and $2,500,000 was to be advanced when the rent roll reached $2.8 million.
The escrow balance was fully paid over on October 24, 1973, pursuant to a recommendation of the mortgagee’s agent in which he stated that the $64,000 value of work still to be *335 completed equalled 2/io of 1% of the project cost. That approximate amount of $32,000,000 coincides with testimony given at a Rent Leveling Board hearing that the estimated construction cost, as originally shown on the mortgage application, was $29,816,122 and that the project would have an estimated completion value, under the capitalization of income approach, of $30,228,800.
N.J.S.A. 54:4-63.3 specifically provides that where a parcel of property contains a building which has been improved after the statutory assessment date and said improvement is completed after January 1 of the tax year, the assessor shall:
... determine the taxable value of such parcel of real property as of the first of the month following the date ... of such completion, and ... if such value so determined exceeds the assessment made as of October 1 preceding .. . enter ... an added assessment ... determined ... by multiplying the amount of such ... excess by the number of whole months remaining in the calendar year after ... such completion, and dividing the result by twelve.
The term “taxable value” was defined in Switz v. Kingsley, 37 N.J. 566, 182 A.2d 841 (1962), wherein Chief Justice Weintraub stated:
Chapter 51 provides that all real property subject to assessment and taxation for local use shall be assessed according to “the same standard of value, which shall be the true value,” but that the assessment shall be expressed in terms of the “taxable value.” The “taxable value” is defined as that “percentage” of true value which each county board of taxation may establish for the taxing districts within the county (section 1; N.J.S.A. 54:4-2.25). The percentage must be a multiple of 10 and may be no lower than 20 or higher than 100 (section 2; N.J.S.A. 54:4-2.26), and the percentage shall be 50 if the county board fails to fix a different one (section 3; NJ.S.A. 54:4-2.27). [at 570, 182 A.2d 841]
Since the Bergen County Board of Taxation, during the period involved, required Fort Lee to assess at 100% of true value, the term “taxable value” is synonymous with “true value.”
In order to comply with N.J.S.A. 54:4-63.3 it is necessary to first determine the true value of the entire property, including both land and improvements. The prior October 1 assessment is then deducted from the new value to arrive at the added value. Such added value is then prorated for the balance of the tax year to arrive at the additional assessment.
Plaintiff presented expert testimony to the effect that the true value of the building, as of March 1, 1973, was $21,662,000. *336 His land value of $5,500 per allowable apartment unit was predicated upon a sale of comparable property immediately adjacent to the subject property. That comparable property was assembled between 1969 and 1972 and was zoned to permit 1,080 apartment units. It was sold for $5,795,000, or $5,366 a unit. Further, he considered the sale, subsequent to March 1, 1973, of the subject land, as distinguished from the improvement, for $3,000,000. This latter was a sale and lease-back with the rent at $330,000 a year.
In considering the value of the improvement plaintiff’s expert testified that he gave the greatest weight to the cost approach. In arriving at his cost approach value he utilized cost figures as reported on the builder’s 1974 income tax return. These figures reflected a hard cost of $18,189,094, and to that figure was added a 15% increment for overhead, profit and soft costs, /. e., taxes, interest, architectural fees, etc., because the general contractor was one of the principal owners of the property. This result in an adjusted total cost of improvements of $20,917,458. He also utilized information from an application filed with the Fort Lee Rent Leveling Board in 1976 which detailed the construction cost of the property as follows:
Land $ 3,000,000
Construction costs 19,663,993
Soft costs 7,152,129
$29,816,122 Total
Plaintiff’s expert then opined that the cost approach would reflect a value of $40,000 a unit, including garage and commercial space, of $19,360,000, rounded to $19,000,000, for the improvement.
Plaintiff’s expert, in estimating a value based on the capitalization of income approach, estimated an economic rent by utilizing the October 1, 1974 rental income potential for the apartments, penthouses, commercial space, laundry, T.V. antenna, health spa memberships, vending machines and garages. The resulting figure of $3,877,813 was reduced by a vacancy and loss allowance of 5%, giving an effective gross income of $3,686,922. From that figure he deducted expenses which included actual *337 expenses for the calendar year 1974 as well as stabilized expenses for payroll, payroll taxes, repairs and maintenance, management and the addition of a 2% reserve for replacement. The total expense, which approximated 35% of the gross rent potential, left a net income of $2,318,410 which he capitalized under the building residual approach by use of an 8% interest rate, actual real estate taxes rounded to 2.6% and a recapture of 2%. The resulting value was $18,822,600.
Recognizing that the subject building had just been completed and that a value under the income approach was conjectural, whereas there was specific knowledge as to construction costs and land values, and taking into consideration the mortgage financing, plaintiff concluded that the property, as of March 1, 1973, had a value of $21,662,000, of which $19,000,000 was attributable to the improvement.
Defendant introduced the opinion of two appraisal experts. Both experts’ opinions, under the cost approach, concluded a value, as of March 1, 1973, which they then rolled back to 1968, the year in which the taxing district had revalued its properties. In this manner they were implementing their understanding of the common level of assessment.
Defendant’s first expert witness concluded that the assessed value of the land properly reflected its true value because his research had disclosed four such assemblages of properties, including the subject, which were made during the period from 1969 through 1972. The transactions, although suspect in several instances because of the involvement of possible related parties, did indicate a value range from $7.86 a square foot for a large 36x/2-acre plot to a high of $17.48 a square foot for the Colony North property adjacent to the subject property. The latter assemblage, however, besides involving several suspect transactions, also included very substantial improvements. It was also more accessible than the subject property, which permitted a more workable development of the property in that the garages could be built on the sloping terrain under the apartment buildings themselves and which permitted access by a *338 lower street entrance. Because of the site it was also substantially better from the standpoint of plottage. Since the assessed value of the subject land equalled $12.15 a square foot, he concluded that the assessment was within the range of an appropriate true value. In computing a replacement cost value to the improvement, he utilized the hard costs reflected on the owner’s federal tax return, to which he added a 15% factor to include overhead, profit and soft costs which he assumed were not included since the general contractor was also a major partner in the construction of the complex. This resulted in a total cost of improvements of $20,917,458. He then utilized the factors for construction costs contained in the New Jersey Assessor’s Manual to roll back those costs from 1972 to 1968 to arrive at a construction cost as of October 1,1968 of $14,059,275. Since he assumed the building was substantially complete on October 1, 1972, his valuation figure would be no different if he specified March 1, 1973 as the valuation date.
Defendant’s first expert witness also computed a value on the capitalization of income approach. Since the 1974 year was the first full year of operation, he used those figures. He acknowledged that he could have projected known rents as of 1972 but that he preferred to take a full subsequent year to arrive at an income value. He also stated that expenses would have been lower in 1972 had it been a fully rented operation at that time. He adjusted the income by deducting 10% for occupancy and rent loss. He used a capitalization factor composed of an 8% interest rate, 2% recapture and an actual tax rate of 2.57%, for a total of 12.5%. This resulted in a total value of $17,396,400. He did not consider it important in his valuation to consider that the Metropolitan Insurance Company had agreed to lend a total of $21,250,000 on a nonrecourse mortgage on the subject property.
Defendant’s second expert testified that he utilized the information from the taxpayer’s 1972 income tax return to reach a value based upon the cost approach. He testified that the taxable value of the property, as of March 1,1973, would be the estimated fair market value as of October 1,1972, assuming that it was completed at that date, adjusted back to 1968. He *339 commenced with the cost figures shown on the 1972 income tax return after eliminating the cost of an automobile that had been included. He did not include in his actual costs any amount attributable to overhead, profit or soft costs. He testified that a builder’s profit of 15% was high, for it could be much lower than that. He also testified that until 1972 or 1973, soft costs ranged in the area of 12% to 15%. His cost figure of $18,024,300 was divided by 149%, a factor derived from the New Jersey Real Property Appraisal Manual, to arrive at a taxable value of $12,096,800, as of October 1, 1968, for the completed improvement. He then estimated the cost to complete the building, as of October 1,1972, at $590,000, which he also divided by 149% to reach a figure of $396,500. He believed this latter figure would be the maximum added assessment, as it represented the taxable value of the improvements that had not been completed as of October 1, 1972. This amount, however, was included in his taxable value of $12,096,800 as of October 1,1972, so he concluded that, under this approach, the added assessment should be zero.
His value based upon the capitalization of income was derived from the first year of complete operation of the building, which was 1974. Income was derived from the rent roll as of October 1, 1974, less 5% for vacancies and rent losses. He utilized actual or economic 1974 expenses without attempting to relate them back to 1972, and did not attempt to determine the level of expenses for comparable projects in 1972. However, since the ratio of expenses to income was 35%, which was in line with other high-rise buildings in Fort Lee, he believed that there would not have been any radical difference in the net income. He arrived at an annual net income, before taxes, of $2,294,115, which he capitalized at a 8.5% return, 2.57% actual tax rate and 2.5% depreciation. He used the assessed value as the value of the land. His conclusion, under the capitalization of income approach, was a market value of $17,367,100. He considered this value to be the same on March 1,1973 as on October 1,1972. He also testified that an income approach valuation would, as of October 1, 1968, have resulted in a lower value than the cost approach value as of that date.
*340 In concluding a value as of March 1, 1973 there are some legal restraints on the information to be utilized. Subsequent events should not be used as the direct evidence of value.
... [Valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight. [New Brunswick v. Tax Appeals Div., 39 N.J. 537, 545, 189 A.2d 702 (1963)].
See, also, Parkview Village Assoc. v. Collingswood, 62 N.J. 21, 29, 297 A.2d 842 (1972); Lamm Associates v. West Caldwell, 1 N.J. Tax 373, 388 (Tax Ct.1980). But see Almax Builders, Inc. v. Perth Amboy, 1 N.J. Tax 31 (Tax Ct. 1980).
The proscription against the use of subsequent events to value property for tax purposes has long been established in federal tax law. Ithaca Trust Co., Executor and Trustee, v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), involved the issue of whether, for federal estate tax purposes, the value of bequests to charities should be reduced by the actuarial value of a prior life estate in decedent’s wife. Since the decedent’s wife had passed away within six months of decedent’s death, the claim was made that the reduction should be computed by the actual six-month life span rather than by use of the mortality tables. Justice Holmes, in addressing the issue, stated as follows:
. .. The first impression is that it is absurd to resort to statistical probabilities when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator’s death. See Hooper v. Bradford, 178 Mass. 95, 97 [59 N.E. 678]. The tax is on the act of the testator not on the receipt of property by the legatees. Young Men’s Christian Association v. Davis, 264 U.S. 47, 50 [44 S.Ct. 291, 292, 68 L.Ed. 558]; Knowlton v. Moore, 178 U.S. 41, 49 [20 S.Ct. 747, 750, 44 L.Ed. 969], and passim; New York Trust Co. v. Eisner, 256 U.S. 345, 348, 349 [41 S.Ct. 506, 507, 65 L.Ed. 963]; Edwards v. Slocum, 264 U.S. 61 [44 S.Ct. 293, 68 L.Ed. 564]. Therefore the value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. See International Harvester Co. v. Kentucky, 234 U.S. 216, 222 [34 S.Ct. 853, 855, 58 L.Ed. 1284], Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future; and the value is no less real at that time if later the prophecy turns out false than when it comes out true. See Lewellyn v. Electric Reduction Co., 275 U.S. 243, 247 [48 S.Ct. 63, 64, 72 L.Ed. 262]. New York v. Sage, 239 U.S. 57, 61 [36 S.Ct. 25, 26, 60 L.Ed. 143]. Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done, but that the value of the *341 wife’s life interest must be estimated by the mortality tables. Our opinion is not changed by the necessary exceptions to the general rule specifically made by the Act. [at 155, 49 S.Ct. at 291]
Later, in Guggenheim v. Helvering, 117 F.2d 469 (2 Cir. 1941) cert. den. 314 U.S. 621, 62 S.Ct. 66, 86 L.Ed. 499 (1941), Judge Learned Hand, in addressing the same issue involving the valuation of the decedent’s interest in a partnership for the purpose of asserting the federal estate tax, had occasion to state as follows:
... If one could have looked ahead, the hopes on which such values were based would have been seen to be unfounded; the cartel was not destined to pull Chilean nitrates out of the mire; but there can be no question that at the moment when — unhappily for his estate — the decedent chanced to die, those hopes were shared as well by persons in a position to know the facts as by the general public. What happened later has nothing to do with the case. Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647. It would have been irrelevant for instance if on September 30, 1930, an earthquake had swallowed every acre of the company’s nitrate beds with all its plants. ... [at 472]
See, also, Miller v. United States, 235 F.2d 553 (6 Cir. 1956), for a detailed discussion of this well established principle.
Both the Ithaca Trust Co. and Guggenheim cases involved estate taxes which required a valuation as of the date of decedent’s death, a principle equally applicable to N.J.S.A. 54:4 63.3 which requires a valuation as of the first of the month following the date of completion.
Apartment complexes of the subject type are normally valued by the capitalization of income method. This is so because they are purchased as investments and their value coincides with the economic return to the investor. When there is a newly constructed complex, with no prior history on which such value can be based, an appraiser should ascertain the income and expenses of comparable structures. While, in this particular situation, the structure had no true comparable since it was, on March 1,1973, the most prestigious luxury apartment building in the area, the appraisers were still required to ascertain a value predicated on facts known or reasonably ascertainable as of March 1, 1973. Here, all appraisal experts, in computing a value based on the capitalization of income, used figures which were not available until nearly two years after the critical date.
*342 While the use of subsequent events as direct evidence of value is not appropriate, a valuation predicated upon subsequent events may, in an appropriate situation, be utilized to corroborate an opinion independently arrived at and based on facts known or reasonably ascertainable as of the critical date. See In re Erie R. R. System, 19 N.J. 110, 115 A.2d 89 (1955); Stanford Enterprises v. East Orange, 1 N.J.Tax 317, 322 (Tax Ct.1980). For that limited purpose, the income approach of the experts has been analyzed.
Plaintiff’s expert utilized a land value predicated upon a comparable which defendant’s first expert showed was not one that could be relied upon. Accordingly, the assessed value of the land will be the actual value for all valuation purposes.
Defendant’s first expert utilized a 10% vacancy and loss factor to arrive at effective gross income. It is recognized that a building during a rent-up process will have a higher than normal vacancy rate. However, to use a 10% factor gives undue weight to the early stage of the renting-up process at the expense of the potential value of the building. Accordingly, a 5% vacancy rate is more than adequate to recognize the status of the building during the rent-up period. Defendant’s second expert used an 8J/2% interest factor in his capitalization rate as compared with the 8% factor used by the other experts. An 8% factor is the most appropriate for the period involved. Without adjusting any of the other differences in the income approach calculations, their income approach values would be from $18,-649,090 to $18,797,506, or a difference of less than 1%. A judgment pursuant to this remand was entered showing a true value as of October 1, 1974, of $18,101,975.
Plaintiff’s expert, in computing a value under the cost method, accepted the construction cost figures of defendant’s first witness, which was $20,917,458. He then opined that the building should have been built at a cost of $40,000 a unit, or $19,360,000 rounded to $19,000,000. He gave no factual basis for this conclusion. An expert’s opinion rises no higher than the data on which it is founded. Passaic v. Gera Mills, 55 N.J.Super. *343 73, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959). Where an expert gives an opinion of value based on his general experience without supporting such value by specific objective data, his opinion is not entitled to any probative value. Berkeley Develop. Co. v. Berkeley Heights Tp., 2 N.J.Tax 438 (Tax Ct.1981); Inmar Associates, Inc. v. Edison Tp., 2 N.J.Tax 59 (Tax Ct.1980).
Defendant’s first witness used a “hard” cost figure of $18,-189,094 plus 15% to cover overhead and profit. He added the 15% because the general contractor was one of the principal owners and that part of the normal construction cost would not be reflected on the tax return. His value, based on the cost approach, was $20,917,458. Defendant’s second expert used a construction cost, as shown on the owner’s 1972 return, of $18,024,300. However, he made no allowance for soft costs or profit.
Accepting defendant’s second expert’s “hard cost” figure of $18,024,300 as of December 31, 1972, and adding thereto a 15% factor to cover soft costs, overhead and profit, the construction cost of the building, as of December 31, 1972, amounted to $20,727,945. In addition, according to the reports of the mortgagee’s representatives, there was approximately $100,000 in additional costs incurred prior to March 1, 1973, or a total construction cost as of March 1, 1973 of $20,827,945. Including a land value of $2,662,000 results in a construction cost value of $23,-489,945, rounded to $23,490,000.
The cost value of $23,490,000 is not corroborated by the income approach value utilizing figures not known as of the critical date. However, recognizing that values do change from year to year, and that the optimism of which dreams are made all too often vanishes in the face of economic reality, it is still the duty of the court to find the true value on what was known or reasonably foreseeable as of March 1,1973. What was known was that the construction costs, including land, amounted to $23,490,000; that a large insurance company had advanced $18,600,000 of an agreed amount of $18,750,000 on a nonrecourse mortgage which limited the security to the value of the proper *344 ty; that the same mortgagee was committed to advance a further sum of $2,500,000 under the same terms when the rent roll amounted to $2.8 million, and that the mortgagee’s professional personnel or agents had originally estimated a total construction cost of approximately $29,800,000 and a market value of over $30,000,000.
The search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963). Consideration may be given to cost, less depreciation, and sales of comparable property. It may also be given to rental income. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 106, 89 A.2d 385 (1952). The answer depends upon the particular facts. Here, the capitalization of income values were predicated upon facts not known or shown to be reasonably anticipated as of the critical date. The court has, necessarily, been relegated to an analysis of the actual cost figures, together with the history of the construction as evidence by the action.of the mortgagee in advancing funds for the construction. It is well settled that original cost of construction is properly to be considered in determining a value for tax purposes. Bostian v. Franklin State Bank, 167 N.J.Super. 564, 569, 401 A.2d 549 (App.Div.1979). This would be particularly so when the building has just been completed. Further, mortgage loans, particularly on nonrecourse mortgages, are relevant evidence. In this respect, see, Trinity Place Co. v. Finance Adm’r., 72 A.D.2d 274, 424 N.Y.S.2d 433 (App.Div.1980), aff’d 51 N.Y.2d 890, 434 N.Y.S. 2d 990, 415 N.E.2d 978 (1980), where, after detailing certain mortgage transactions, the court stated:
... These mortgages would seem to be substantially as cogent evidence of value as would arm’s length sales during or about the tax years in question. For, like such sales, such mortgages represent an investment by willing business men of sums of money at about the tax period, in return for an interest in the property, based on their judgment that the property was worth at least such amounts. There is no suggestion that the mortgagees did not actually advance sums equal to the principal amounts of the mortgages .... [424 N.Y.S.2d at 435]
I accordingly find that the value of the subject property, as of March 1,1973 when it was substantially completed, was $23,490,-000.
*345 Defendant’s position is that this court should enter a judgment either limited to the actual construction costs incurred after October 1, 1972, or that the true value, predicated on construction costs, should be rolled back to what those construction costs would have been in 1968, which was the date of the revaluation of the properties in Fort Lee.
As previously noted, N.J.S.A. 54:4-63.3 specifically provides the formula for computing the added assessment. Further, the rollback of construction costs to arrive at a construction cost value as of 1968 would be the implementation of relief from an allegedly discriminatory assessment. The opinion on remand specifically stated that, as discrimination relief was erroneously granted in the prior Division of Tax Appeals opinion, the determination relating solely to the added assessment may not afford the taxpayer any such relief.
A true value of $23,490,000, as of March 1, 1973, would result in an added assessment of $5,234,333. As this figure exceeds the original added assessment of $4,079,167, there can be no increase because the taxing district did not appeal said assessment to the county board. Matawan v. Tree Haven Ap’ts, 108 N.J.Super. 111, 260 A.2d 235 (App.Div.1969); Lamm Associates v. West Caldwell, 1 N.J.Tax 373 (Tax Ct.1980).
The Clerk will enter a judgment showing an added assessment as of March 1, 1973, in the amount of $4,079,167.