# TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

May 11, 2018

Bruce J. Stavitsky, Esq.
Stavitsky & Associates, LLC
350 Passaic Avenue
Fairfield, New Jersey 07004

Robert D. Blau, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

> Re: St. Elizabeth Hospital/Trinitas Healthcare Corp. v. City of Elizabeth
> Docket Nos. 015624-2011, 015248-2012, 014042-2013, 013679-2014
> and 013239-2015

Dear Mr. Stavitsky and Mr. Blau:

This letter constitutes the court's opinion following trial of local property tax appeals filed by plaintiff, St. Elizabeth Hospital/Trinitas Healthcare Corp. ("St. Elizabeth Hospital"). St. Elizabeth Hospital challenges the 2011, 2012, 2013, 2014, and 2015 tax year assessments on its improved property located in the City of Elizabeth ("Elizabeth City").

For the reasons stated more fully below, the court reduces the 2011 tax year assessment and affirms the 2012, 2013, 2014, and 2015 tax year assessments.

## I. Procedural History and Findings of Fact

St. Elizabeth Hospital is the owner of the real property and improvements located at 242-260 Williamson Street, Elizabeth, New Jersey. The property is identified on Elizabeth City's tax

map as Block 6, Lot 1653 (the "subject property"). The subject property is a rectangular-shaped, 1.2778 acre lot, located on the campus of the St. Elizabeth Hospital/Trinitas Regional Medical Center. The site is improved with a masonry and steel five-story medical arts building, constructed in 1994 (the "medical arts building"). The subject property also contains a portion of a four-story public parking deck constructed in 1994.[1] Parking for the medical arts building is provided by the attached four-story public parking deck.

The medical arts building is attached, on the westerly side, to the Trinitas Regional Medical Center and attached, on the easterly side, to the four-story public parking deck. The medical arts building contains a gross floor area of approximately 65,860 square feet, and a leasable area of 51,101 square feet.[2] As of the October 1, 2010 and October 1, 2011 valuation dates, the medical arts building consisted of twenty-seven offices. As of the October 1, 2012, October 1, 2013, and October 1, 2014 valuation dates, the medical arts building consisted of twenty-eight offices. One of the offices is a retail pharmacy, offering a walk-up window.

The subject property is located in Elizabeth City's R-4 Elevator Apartment district with permitted uses that include single-family, two-family, and three to four-family dwellings, garden apartments, and multifamily dwellings. The R-4 Elevator Apartment district does not permit medical offices. Therefore, operation of the property as medical office building is a

---

[1] During direct examination St. Elizabeth Hospital's appraiser testified that the parking deck was not located on the subject property. However, during cross-examination St. Elizabeth Hospital's appraiser changed his testimony, concluding instead that a portion of the parking deck, which he estimated at 50%, is located on the subject property.

[2] St. Elizabeth Hospital's appraiser estimated the leasable area of the medical arts building to be 50,238 square feet. The expert derived his estimated leasable area from the December 31, 2015 rent roll and discussions with the property manager. However, cross-examination revealed two discrepancies in the leasable area between the December 31, 2015 rent roll and a May 26, 2016 rent roll prepared by St. Elizabeth Hospital's property manager. The May 26, 2016 rent roll states that the medical arts building consists of 51,101 square feet of leasable area. A review of the May 26, 2016 rent roll disclosed that unit 304 consists of 2,302 square feet and unit 406 consists of 883 square feet. Conversely, the December 31, 2015 rent roll stated that unit 304 consists of 1,484 square feet and unit 406 consists of 838 square feet. The court's review of the April 1, 2016 Lease Agreement for unit 304 confirms that it consists of a leasable area of 2,302 square feet. Accordingly, the court finds the leasable area of the medical arts building to be 51,101 square feet.

nonconforming, legally permitted use.  The subject property is located in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

For the 2011, 2012, 2013, 2014, and 2015 tax years, the subject property bore the following tax assessment:

Land:            $ 67,900
Improvement: $716,900
Total:            $784,800

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Elizabeth City is 11.80% for the 2011 tax year, 12.88% for the 2012 tax year, 13.35% for the 2013 tax year, 13.88% for the 2014 tax year, and 13.21% or the 2015 tax year.  See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the tax assessment, the implied equalized value of the subject property is $6,650,847 for the 2011 tax year, $6,093,168 for the 2012 tax year, $5,878,652 for the 2013 tax year, $5,654,179 for the 2014 tax year, and $5,940,954 for the 2015 tax year.

At trial, St. Elizabeth Hospital offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation (the "expert").  In the expert's opinion, the subject property's neighborhood is "defined by" the Trinitas Regional Medical Center.  According to the expert, the "Trinitas Hospital is the main source of business for our building and it's the main economic influence for this building as well.  It really does dominate this particular portion of the City of Elizabeth."  The expert further expressed that the medical arts building's "location adjacent to a hospital is a major benefit. . . ."  Therefore, the expert concluded that the medical arts building is "an institutionally invested type of property, a premier property. . . ."

During the tax years at issue, the medical arts building was managed by a property management firm.  Due, in part, to the diligence of the property manager and the medical arts

building's attractiveness to medical professionals in the Elizabeth and Union County marketplaces, during the tax years at issue the medical arts building experienced a very low vacancy rate. Although the expert did not calculate its actual vacancy rate, the court's review of the rent rolls for the tax years at issue disclosed that all units were either fully occupied, or vacant for only brief periods of time before being re-let. The medical arts building tenants consist of physicians and other medical-related professionals who are affiliated with Trinitas Regional Medical Center. Any tenant seeking to lease office space in the medical arts building must be "on the hospital medical staff at Trinitas Hospital" and must agree to "comply with the religious covenants of Trinitas Hospital. . . ." All leases are either gross or modified gross, where St. Elizabeth Hospital bears responsibility for all real estate taxes, insurance, security, repairs, maintenance, and utilities.

The expert prepared an appraisal report expressing his opinion of the true value of the subject property as of the October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, and October 1, 2014 valuation dates. The expert relied exclusively on the income capitalization approach to value the subject property.

The expert offered his opinion that the subject property had a true market value as follows:

| 10/1/2010 | 10/1/2011 | 10/1/2012 | 10/1/2013 | 10/1/2014 |
|-----------|-----------|-----------|-----------|-----------|
| $4,390,000 | $4,400,000 | $4,300,000 | $4,270,000 | $4,420,000 |

During trial, St. Elizabeth's Hospital also offered testimony from Enrico Emma. Mr. Emma is, and has served as, Elizabeth City's municipal tax assessor since July 1, 1995. Mr. Emma acknowledged that his office bears responsibility for maintaining and updating Elizabeth City's tax roll and property record cards. According to Mr. Emma, the subject property's record card reflects that it consists of "offices." Moreover, Mr. Emma admitted that the property record card fails to disclose whether all, or what portion of the parking deck is located on the subject property. Significantly, Elizabeth City's property record card fails to disclose what portion of the subject

4

property's local property tax assessment, if any, is attributable to the parking deck. In Mr. Emma's opinion, some portion of the subject property's local property tax assessment should be attributable to the parking deck. However, Mr. Emma was unable to confirm whether the 2011, 2012, 2013, 2014, or 2015 tax year assessments on the subject property included, or excluded the parking deck or whether the parking deck was assessed to another property.

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Ibid. (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient

5

to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of validity. If the court independently concludes that the plaintiff has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, Elizabeth City argues that St. Elizabeth Hospital failed to overcome the presumption of validity that attaches to the subject property's tax assessments. Elizabeth City maintains that because the expert failed to account for the parking deck, and how the parking deck may contribute to the overall value of the subject property, the court must dismiss St. Elizabeth Hospital's complaints. Conversely, St. Elizabeth Hospital argues that its tax appeals challenge only the value of the improvements and real property actually assessed by Elizabeth City. St. Elizabeth Hospital maintains that because no evidence was presented that any portion of the subject property's local property tax assessments for the 2011, 2012, 2013, 2014, or 2015 tax years included the parking deck, consideration of the contributing value of the parking deck would be misplaced. Finally, St. Elizabeth Hospital asserts that because only a portion of the parking deck is located on the subject property, the parking deck may be wholly assessed to another property that is not the subject matter

of these tax appeals. Therefore, St. Elizabeth Hospital asserts that dismissal of their complaints is not warranted.

Our State's Constitution requires that all "[p]roperty shall be assessed for taxation under general laws and by uniform rules." N.J. Const., Art. VIII, § I, ¶. 1. Thus, all rights and interests in property must be valued for tax purposes. Municipal tax assessors are charged with the responsibility to "determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1" of the pretax year. N.J.S.A. 54:4-23. Our courts have interpreted these constitutional and legislative tenets to mean the "full and fair value [of] the totality of all interests in the property." Lidell v. Mimosa Lakes Ass'n, 6 N.J. Tax 417, 423 (Tax 1984). Our Supreme Court declared that the term "real property," under N.J.S.A. 54:4-23, "include[s] the land and its 'concomitant improvements.'" Koester v. Hunterdon County Bd. of Taxation, 79 N.J. 381, 392 (1979) (quoting City of Newark v. West Milford Twp., Passaic County, 9 N.J. 295, 304 (1975)). Implicit in the legislation are "[p]rinciples of fairness and equality." Ibid. As Chief Justice Weintraub expressed, "things equal to each other in the context of the local real property tax involved shall be treated equally." Switz v. Kingsley, 37 N.J. 566, 572 (1962).

However, based on the evidence presented, the court is unable to conclude whether the parking deck was wholly or partially assessed to another property, or included in the subject property's 2011, 2012, 2013, 2014, or 2015 assessments. The court's review of the subject property's record card discloses that it is identified only as a "5 s[tory] B/Off. Bldg." Significantly, Elizabeth City's municipal tax assessor was unable to confirm whether the subject property's 2011, 2012, 2013, 2014, or 2015 tax year assessments included, or excluded any part of the parking deck. Moreover, Elizabeth City's municipal tax assessor was unable to provide any guidance whether

the entire parking deck was assessed, wholly or partially, to one of the immediately adjacent properties.

As a general rule, dismissal of a taxpayer's complaints is warranted when a valuation expert has failed to account for and properly attribute a value to all the improvements located on a given property. See Pantasote Co. v. City of Passaic, 6 N.J. Tax 34, 41 (Tax 1983). However, as stated above, municipal tax assessors are charged with the responsibility of determining the full and fair value of all real property, inclusive of all "concomitant improvements," as of October 1st of the pretax year. Here the property record card for the subject property failed to disclose that any part of the parking deck was located on the subject property. Moreover, Elizabeth City's municipal tax assessor was unable to state with any degree of certainty whether the parking deck was assessed to the subject property or to another property. Therefore, based on the expert's review of the tax roll and the property record card, it was not evident that any part of the parking deck was located on and assessed to the subject property. Dismissal of St. Elizabeth Hospital's complaints under these circumstances would be tantamount to ensuring municipalities a litigational advantage due to the failure of a municipal assessor to carry out their statutory duty to determine the full and fair value of each parcel of real property and maintain accurate records reflecting those values. N.J.S.A. 54:4-23. Our Supreme Court has demanded that "government officials act solely in the public interest. In dealing with the public, government must 'turn square corners'. . . [i]t may not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner. Its primary obligation is to comport itself with compunction and integrity. . . ." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426-427 (1985).

Therefore, according St. Elizabeth Hospital all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that St. Elizabeth Hospital

produced cogent evidence sufficient to overcome the presumption of validity that attaches to the local property tax assessments. If accepted as true, the opinions of St. Elizabeth Hospital's expert and the facts upon which he relied raise debatable questions regarding the correctness of the subject property's local property tax assessment for the 2011, 2012, 2013, 2014, and 2015 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

b. Highest and Best Use

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Borough of Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. Ford Motor Co., 127 N.J. 290 (1992). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is

9

often referred to as "the first and most important step in the valuation process." <u>Ford Motor Co. v. Twp. of Edison</u>, 10 N.J. Tax 153, 161 (Tax 1988).

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." <u>Clemente v. Twp. of South Hackensack</u>, 27 N.J. Tax 255, 267-269 (Tax 2013), <u>aff'd</u>, 28 N.J. Tax 337 (App. Div. 2015). <u>See also</u> <u>County of Monmouth v. Hilton</u>, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, the expert concluded that the highest and best use of the subject property, as vacant, was for a multifamily elevator apartment development, because use of the subject property as a medical office building was not permitted within the R-4 Elevator Apartment district. Additionally, after giving consideration to all legally permitted, physically possible, financially feasible, and maximally productive alternate uses, the expert concluded that the highest and best use of the subject property, as improved, was its existing use as a medical arts office building.

### c. Income Capitalization Approach

"There is no single determinative approach to the valuation of real property." <u>125 Monitor Street LLC v. City of Jersey City</u>, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing <u>Samuel Hird & Sons, Inc. v. City of Garfield</u>, 87 N.J. Super. 65, 72 (App. Div. 1965)); <u>ITT Continental Baking Co. v. East Brunswick Twp.</u>, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." <u>Brown v. Borough of Glen Rock</u>, 19 N.J. Tax 366, 376 (App. Div. 2001), <u>certif.</u> <u>denied</u>, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by

the experts."  Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).  See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

Here, the expert exclusively relied on the income capitalization approach to derive an opinion of market value for the subject property.  When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Vill. Apartments Co. v. Twp. of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996).  "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value."  Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013).  As Judge Hopkins succinctly stated, in valuing a property employing the income-capitalization approach:

> the gross rental value of the property is estimated.  From the estimated gross rental there is deducted a factor for possible vacancies and collection losses.  This results in effective gross income.  Then all the expenses involved in running the property are subtracted, resulting in net income.  Net income is the money which an investor could expect to receive through an investment in the property.  It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Thus, central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co., 108 N.J. at 270.

1. Market Rent

The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, "this does not mean that the actual rent is to be disregarded . . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).

According to the expert, between August 1, 2009 and August 1, 2014, eleven (11) office leases were entered into between St. Elizabeth Hospital and tenants for portions of the medical arts building. The rents ranged from $21.83 per square foot to $34.33 per square foot. Despite the availability of this rental information, the expert elected not to use any leases for the subject property in establishing his market rent. Instead, the expert identified eight leases of non-medical and medically related office space located in Elizabeth, Union Township, Hillside, Springfield, and Linden, entered into between July 2008 and March 2012. Seven of the leases were modified gross or gross lease agreements, and one was a triple net lease. The rents ranged from $13.85 per

12

square foot to $23.42 per square foot. For each valuation date involved herein, the expert relied on a grouping of four of the eight leases.

Significantly however, none of the office leases relied on by the expert were located on the campus of a regional medical center, nor in close proximity to Trinitas Regional Medical Center. As the expert readily observed, the subject property's proximity to Trinitas Regional Medical Center is a "major benefit" and is "the main economic influence for this building . . . It really does dominate this particular portion of the City of Elizabeth." Moreover, the expert offered no testimony regarding the availability of parking for any of the identified eight office lease locations. Here, the medical arts building is located immediately adjacent to a four-story public parking deck, affording vehicular access and parking for lessees, their employees, visitors, and guests.

It is well-settled, that one of the key elements of comparison in a rental analysis is "location – [t]ime-distance linkages and unit-specific locations in project." Appraisal Institute, The Appraisal of Real Estate, 466 (14th ed. 2013). By definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). However, it is pivotal for an appraiser to establish appropriate "elements of comparison for a given appraisal through market research and [to] support those conclusions with market evidence." The Appraisal of Real Estate, at 390.

Here, to account for the disparity in the quality of the location of the medical arts building and the comparable leases, the expert applied a 10% location adjustment to each of the eight comparable leases. In the expert's opinion, the medical arts building's location next to the Trinitas

Regional Medical Center was "superior" to all of the comparable leases. In addition, the expert expressed that comparable leases 1, 2, 6, and 8 were "not the same quality" as the medical arts building and applied a positive 10% adjustment.

However, the expert failed to offer any credible explanation how his 10% location and 10% quality adjustments were derived that was rooted in objective market data, and supported by detailed factual information. The only support offered in the expert's report for the location adjustment was that the "subject is situated in a good location . . . adjacent to the Trinitas Hospital. In our opinion . . . the location adjacent to the hospital is a major benefit and all leases were therefore adjusted to reflect this factor." The expert offered no description, photographs or features distinguishing the eight office lease locations from the medical arts building. Moreover, the expert offered no analysis of medical office leases located in close proximity to a medical center in contrast to those located distant from medical centers. Simply stated, the expert did not offer any facts or data supporting his adjustments enabling the court to conclude that they are inherently reliable. Additionally, the expert failed to offer any evidence how the medical office marketplace would account for readily available access to vehicular parking, or being in close proximity to a public four-story parking deck.

Therefore, the court does not find that the five office leases in Union Township, Hillside, Springfield, and Linden, and the three office leases in Elizabeth, not located on the campus of a medical center, and not possessing parking facilities akin to those that are available to the subject property are comparable to, and thus, competitive in the marketplace with the subject property.

Additionally, effective cross-examination revealed that the expert's data verification process suffered from flaws that raised material questions regarding the credibility and reliability of the comparable lease information. The expert admitted that he did not review, nor have in his

possession copies of any of the eight comparable leases or lease abstracts. Instead, the sole source of data and information for the eight comparable leases were his communications, email exchanges, or discussions with other appraisers in the community. The expert did not review leases or lease abstracts, was unfamiliar with the interior condition of any of the comparable leases, and did not verify any of the lease terms, including their inception dates, leased areas, lease terms, or rental values with the landlord, landlord's attorney, tenant, tenant's attorney, or any real estate brokers involved in the transactions. The expert admitted that although he possessed information about the transaction participants, due to time constraints he was unable to verify any of the lease data or information.

Accordingly, for the above-stated reasons the court rejects the expert's eight comparable leases in establishing the market or economic rent for the subject property.

Nonetheless, using the eleven (11) leases entered into for office suites in the medical arts building between 2009 and 2014 as a gauge, the court was able to discern an economic or market rental value for the medical arts building. Between 2009 and 2012, five leases were entered into for office suites in the medical arts building at rental rates between $21.83 and $34.33, with a median rate of $24.98 and average of $25.69.[3] Therefore, the court concludes that a $25.00 psf market or economic rent should be utilized as of the October 1, 2010, October 1, 2011 and October 1, 2012 valuation dates. Between 2013 and 2014 six leases were entered into for office suites in the medical arts building at rental rates between $23.63 and $26.82, with a median rate of $25.69 and average of $25.48. Therefore, the court concludes that a $25.55 psf market or economic rent should be utilized as of the October 1, 2013 and October 1, 2014 valuation dates.

_____

[3] According to the medical arts building's rent roll, each lease included either a 3% or 4% annual rental increase.

2. Vacancy and Collection Loss

The expert applied a stabilized vacancy and collection loss factor to the subject property of 7.0% as of the October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, and October 1, 2014 valuation dates. The expert relied primarily on office vacancy rates for Union County, New Jersey set forth in the Cushman & Wakefield MarketBeat publication. However, these rates were for general office space and were not specific to medical office buildings. Admittedly, the expert acknowledged that the medical arts building experienced a very low vacancy rate during all tax years at issue. The court's review of the building's rent rolls confirms that it either experienced no vacancies or de minimus vacancies during the 2009, 2010, 2011, 2012, 2013 and 2014 tax years. Moreover, the expert offered credible testimony that the building experienced such low vacancy rates due, in part, to the proactive efforts of the building's property manager, and its superior location next to the Trinitas Regional Medical Center.

Therefore, based on the court's review of the medical arts building's vacancy rates during the tax years at issue, the court will apply a vacancy and collection loss factor of 5% as of the October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, and October 1, 2014 tax years.

3. Operating Expenses

Under a gross lease agreement, the landlord is responsible for the real estate taxes and "all of the property's operating and fixed expenses." The Dictionary of Real Estate Appraisal, at 91. Thus, generally, under a gross lease, the landlord is responsible for all real estate taxes, maintenance and repairs, reserves, management, and insurance expenses associated with the property.

16

Here, in determining the variable and fixed expenses for the medical arts building, the expert reviewed St. Elizabeth Hospital's actual operating expense statements for the 2010 through 2015 calendar years.

For all tax years involved herein, the expert applied a management fee expense of 5% of Effective Gross Income. According to the expert, St. Elizabeth Hospital compensates its property manager in the sum of five (5%) percent of the gross receipts for managing the property. Accordingly, the court accepts the expert's management fee expense of 5% of Effective Gross Income as reasonable in the marketplace.

In addition, the expert determined the following stabilized expenses for the property: (1) leasing commission expenses of 5% of Effective Gross Income; (2) maintenance, repairs, and security at $4.00 psf; (3) utility expenses at $4.50 psf; (4) insurance expenses at $0.25 psf; (5) miscellaneous expenses of 2% of Effective Gross Income; (6) reserves for replacements of 2% of Effective Gross Income; (7) tenant improvement allowance of $1.00 psf; and (8) an additional insurance expense of $0.25 psf.[4]

In the expert's opinion, leasing commissions of five (5%) percent are reasonable and customary in the marketplace. The expert credibly testified that the property manager is compensated for leasing the medical arts building at a rate equal to five (5%) percent of the total rents collected during the initial lease term, including one extension term, and at a rate of two (2%) percent of the total rent collected on any renewal thereafter. Therefore, the court accepts the expert's leasing commission expense of five (5%) percent of Effective Gross Income.

Next, the expert stabilized expenses for maintenance, repairs, security, utilities, and insurance in the sum of $8.75 psf. In order to calculate the foregoing stabilized expense rate, the

---

[4] The expert acknowledged that all of his net operating income calculations erroneously included two (2) deductions of $0.25 psf each for insurance expenses.

expert examined the subject property's actual income and expense statements and Institute of Real Estate Management ("IREM") data. The IREM data considered by the expert included suburban office buildings in the metropolitan northern New Jersey area and downtown office buildings in the Region 1 (CT, ME, MA, NH, RI & VT), Region 2 (DE, NJ, NY & PA), and Region 3 (MD, VA & Washington, DC) geographical areas.

The expert's analysis of the income and expense data for the subject property revealed that actual utility expenses ranged from $3.85 psf to $5.24 psf during the tax years at issue. Moreover, the IREM reports disclosed a range of utility expenses during that period of between $1.82 psf to $3.94 psf. In the expert's opinion, based on the subject property's use and location, a utility expense, stabilized at $4.50 psf, was reasonable. The court concludes that a stabilized utility expense of $4.50 psf is reasonable for the subject property.

The expert's analysis of the income and expense data for the subject property disclosed that actual maintenance, repair, and security expenses ranged from $2.83 psf to $3.68 psf during the tax years at issue. Additionally, the IREM reports revealed maintenance, repair, and security expenses of between $2.89 psf to $5.22 psf during the same period. Thus, the expert concluded that a maintenance, repair, and security expense stabilized at $4.00 psf, was reasonable. The court concludes that a stabilized maintenance, repair, and security expense of $4.00 psf is reasonable for the subject property.

Although the subject property's expense statements did not reflect any expense for insurance, the expert analyzed the IREM data to compute a stabilized insurance expense for the subject property.[5] The IREM reports disclosed insurance expenses of between $0.14 psf to $0.35 psf. Thus, the expert concluded that an insurance expense, stabilized at $0.25 psf, was reasonable.

---

[5] Insurance coverage for the subject property is apparently provided under a blanket insurance policy procured by Trinitas Regional Medical Center.

18

The court concludes that a stabilized insurance expense of $0.25 psf is reasonable for the subject property.

The expert applied a reserve for replacements of $0.36 per square foot of gross building area, or 2% of Effective Gross Income. The court concludes that the expert's proposed reserve for replacements of 2% of Effective Gross Income is reasonable for the subject property.

Next, the expert applied a miscellaneous expense of 2% to the Effective Gross Income. However, the expert offered no support for said expense, nor did he offer any clarity on what type of expenses would be included in such category. The only evidence in support of such expense is found in the expert's report stating, "Miscellaneous" expenses "will be stabilized at 2% of EGI inclusive of the audit and professional fees." This explanation does not offer meaningful insight into the vast array of expenses potentially contemplated by the expert. Accordingly, the court rejects the expert's miscellaneous expense of 2% of Effective Gross Income. Nonetheless, based on the court's review of the subject property's income and expense statements for the 2010 through 2015 calendar years, the court observes that certain professional, administrative, and audit expenses were incurred in the operations of the subject property. Additionally, based on the court's analysis of the IREM data appended to the expert's report, the court discerns that general payroll administrative expenses ranged between $0.01 psf to $0.69 psf for the 2010 through 2015 years. Therefore, the court concludes that a general payroll administrative expense of $0.40 psf is reasonable in the marketplace and will apply same to the subject property's Effective Gross Income.

Finally, the expert applied a stabilized tenant improvement allowance of $1.00 psf to the subject property. In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made. If this work is performed at the landlord's expense

and is required to achieve market rent, the expense of these improvements should be included in the reconstructed operating statement as part of the replacement allowance." Hull Junction Holding Corp., 16 N.J. Tax at 106 (citing The Appraisal of Real Estate, 450 (10th ed. 1992)). However, here evidence was offered by the expert that a tenant improvement allowance was not required to achieve market rent for the subject property. In fact, the expert submitted that as a general rule, St. Elizabeth's Hospital does not afford tenants any allowance for tenant improvements. The material driving force achieving market rent was the medical arts building's location next to the Trinitas Regional Medical Center. However, none of the eight comparable leases relied on by the expert were seemingly impacted by the same market influences, as they were not located on the campus of a regional medical facility. Moreover, the expert's analysis of tenant improvement allowances for non-medical arts buildings in Essex and Passaic Counties provided no meaningful insight that tenant improvements are required in the subject property's vicinity to achieve market rent. Finally, the court's review of the medical arts building's leases that were offered into evidence discloses that none of the leases made provision for a tenant improvement allowance. Accordingly, for the foregoing reasons, the court rejects application of a tenant improvement allowance for the subject property.

       4. Capitalization

Direct capitalization is a "method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491. Thus, the capitalization rate is the device that converts net operating income into an estimate of property value.

Here, in deriving his overall capitalization rates, the expert consulted a variety of investor surveys and employed the Band of Investment technique. The investor surveys are completed by market participants engaged in real estate financing transactions during given time periods. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal of Real Estate, 467 (10th ed 1992)). In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 279-80 (1985)).

In arriving at his capitalization rates, the expert reviewed Korpacz/PWC National CBD (Central Business District) Office Market surveys, Korpacz/PWC National Suburban Office Market surveys, and Korpacz/PWC National Medical Office Buildings Market surveys for the 3rd Quarter 2010, 3rd Quarter 2011, 3rd Quarter 2012, 3rd Quarter 2012, 3rd Quarter 2013, and 3rd Quarter 2014. The expert also considered RERC Second-Tier East Coast Investment Properties Office CBD surveys for the Fall 2010, Fall 2011, Fall 2012, Fall 2013, and Fall 2014. Finally, the expert reviewed American Council of Life Insurers ("ACLI") Commercial Mortgage Commitments for office buildings with loan amounts between $2 million - $4,999,000 for the 3rd Quarter 2010, 3rd Quarter 2011, 3rd Quarter 2012, 3rd Quarter 2013, and 3rd Quarter 2014, to gauge the market contract interest rates and loan-to-value ratios.

Employing the Band of Investment technique and his review of the above-referenced tables and survey data, the expert concluded the following base capitalization rates for the subject property:

| Tax Year | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Base Capitalization Rate | 8.75% | 8.50% | 8.50% | 8.25% | 8.00% |

"[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

The court considered the testimony of the expert and has evaluated, reviewed, and analyzed the supporting surveys, tables, and mortgage/equity calculations. The court highlights the following table of capitalization rates, examined by the expert, reflecting national average capitalization rates for the 3rd quarter of each given year in specific market segments:

| | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Korpacz/PWC National Central Business Dist. | 8.01% | 6.91% | 6.85% | 6.59% | 6.16% |
| Korpacz/PWC National Suburban Office | 8.40% | 7.47% | 7.53% | 7.51% | 6.72% |
| Korpacz/PWC National Medical Office Buildings | 8.58% | 8.10% | 7.94% | 7.77% | 7.60% |

Based on the testimony elicited from the expert that the subject property's neighborhood is "defined by" Trinitas Regional Medical Center and that it is the "main economic influence for

this building," the court concludes that the subject property possesses characteristics akin to both a central business district location and as premier investment grade medical office building. Accordingly, the court finds that the following capitalization rates should apply to the subject property:

| Tax Year | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Capitalization Rate | 8.30% | 7.75% | 7.50% | 7.25% | 7.10% |

For the reasons set forth above, the court finds the true value of the subject property under the income-capitalization approach to be: $5,463,494, as of October 1, 2010; $5,627,348, as of October 1, 2011; $5,616,819, as of October 1, 2012; $5,798,643, as of October 1, 2013; and $5,914,066, as of October 1, 2014.

**2011 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| $25.00 (Gross) | @ 51,101 sq. ft. | | $1,277,525 |

| | | | |
|---|---|---|---|
| TOTAL: POTENTIAL GROSS INCOME | | | $1,277,525 |
| LESS: Vacancy & Collection Loss | @ 5.00% | | ($ 63,876) |
| TOTAL: EFFECTIVE GROSS INCOME | | | $1,213,649 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $ 60,682 | |
| Leasing Commissions | @ 5% of EGI | $ 60,682 | |
| Replacement Reserves | @ 2% of EGI | $ 24,273 | |
| Fixed Expenses | $8.75 psf @ 51,101 sq. ft. | $447,134 | |
| Payroll/Admin. Expense | $0.40 psf x 51,101 sq. ft. | $ 20,440 | |
| TOTAL: EXPENSES | | | ($ 613,211) |

| | |
|---|---|
| NET OPERATING INCOME | $ 600,438 |

| | |
|---|---|
| BASE CAPITALIZATION RATE | 8.30% |
| TAX RATE | 2.69% |
| TOTAL CAPITALIZATION RATE | 10.99% |

| | |
|---|---|
| INDICATED VALUE | $5,463,494 |

23

**2012 Tax Year**

INCOME:

| | | |
|---|---|---|
| $25.00 (Gross) | @ 51,101 sq. ft. | $1,277,525 |

TOTAL: POTENTIAL GROSS INCOME $1,277,525
LESS:   Vacancy & Collection Loss      @ 5.00%      ($   63,876)
TOTAL: EFFECTIVE GROSS INCOME $1,213,649

EXPENSES:

| | | |
|---|---|---|
| Management | @ 5% of EGI | $ 60,682 |
| Leasing Commissions | @ 5% of EGI | $ 60,682 |
| Replacement Reserves | @ 2% of EGI | $ 24,273 |
| Fixed Expenses | $8.75 psf @ 51,101 sq. ft. | $447,134 |
| Payroll/Admin. Expense | $0.40 psf x 51,101 sq. ft. | $ 20,440 |

TOTAL: EXPENSES ($ 613,211)

NET OPERATING INCOME $   600,438

| | |
|---|---|
| BASE CAPITALIZATION RATE | 7.75% |
| TAX RATE | 2.92% |
| TOTAL CAPITALIZATION RATE | 10.67% |

INDICATED VALUE $5,627,348

---

**2013 Tax Year**

INCOME:

| | | |
|---|---|---|
| $25.00 (Gross) | @ 51,101 sq. ft. | $1,277,525 |

TOTAL: POTENTIAL GROSS INCOME $1,277,525
LESS:   Vacancy & Collection Loss      @ 5.00%      ($   63,876)
TOTAL: EFFECTIVE GROSS INCOME $1,213,649

EXPENSES:

| | | |
|---|---|---|
| Management | @ 5% of EGI | $ 60,682 |
| Leasing Commissions | @ 5% of EGI | $ 60,682 |
| Replacement Reserves | @ 2% of EGI | $ 24,273 |
| Fixed Expenses | $8.75 psf @ 51,101 sq. ft. | $447,134 |
| Payroll/Admin. Expense | $0.40 psf x 51,101 sq. ft. | $ 20,440 |

TOTAL: EXPENSES ($ 613,211)

NET OPERATING INCOME $   600,438

| | |
|---|---|
| BASE CAPITALIZATION RATE | 7.50% |
| TAX RATE | 3.19% |
| TOTAL CAPITALIZATION RATE | 10.69% |

INDICATED VALUE $5,616,819

**2014 Tax Year**

INCOME:

| | | |
|---|---|---|
| $25.55 (Gross) | @ 51,101 sq. ft. | $1,305,631 |

| | | |
|---|---|---|
| TOTAL:POTENTIAL GROSS INCOME | | $1,305,631 |
| LESS:   Vacancy & Collection Loss | @ 5.00% | ($   65,282) |
| TOTAL: EFFECTIVE GROSS INCOME | | $1,240,349 |

EXPENSES:

| | | |
|---|---|---|
| Management | @ 5% of EGI | $ 62,017 |
| Leasing Commissions | @ 5% of EGI | $ 62,017 |
| Replacement Reserves | @ 2% of EGI | $ 24,807 |
| Fixed Expenses | $8.75 psf @ 51,101 sq. ft. | $447,134 |
| Payroll/Admin. Expense | $0.40 psf x 51,101 sq. ft. | $ 20,440 |
| TOTAL: EXPENSES | | ($  616,415) |

| | |
|---|---|
| NET OPERATING INCOME | $  623,934 |

| | |
|---|---|
| BASE CAPITALIZATION RATE | 7.25% |
| TAX RATE | 3.51% |
| TOTAL CAPITALIZATION RATE | 10.76% |

| | |
|---|---|
| INDICATED VALUE | $5,798,643 |


**2015 Tax Year**

INCOME:

| | | |
|---|---|---|
| $25.55 (Gross) | @ 51,101 sq. ft. | $1,305,631 |

| | | |
|---|---|---|
| TOTAL:POTENTIAL GROSS INCOME | | $1,305,631 |
| LESS:   Vacancy & Collection Loss | @ 5.00% | ($   65,282) |
| TOTAL: EFFECTIVE GROSS INCOME | | $1,240,349 |

EXPENSES:

| | | |
|---|---|---|
| Management | @ 5% of EGI | $ 62,017 |
| Leasing Commissions | @ 5% of EGI | $ 62,017 |
| Replacement Reserves | @ 2% of EGI | $ 24,807 |
| Fixed Expenses | $8.75 psf @ 51,101 sq. ft. | $447,134 |
| Payroll/Admin. Expense | $0.40 psf x 51,101 sq. ft. | $ 20,440 |
| TOTAL: EXPENSES | | ($  616,415) |

| | |
|---|---|
| NET OPERATING INCOME | $  623,934 |

| | |
|---|---|
| BASE CAPITALIZATION RATE | 7.10% |
| TAX RATE | 3.45% |
| TOTAL CAPITALIZATION RATE | 10.55% |

| | |
|---|---|
| INDICATED VALUE | $5,914,066 |

Having reached conclusions of the true market value of the subject property, the court will determine the correct assessments for the 2011, 2012, 2013, 2014, and 2015 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value    x    Average ratio =    Revised taxable value

For the 2011 tax year, application of the Chapter 123 ratio results in an applied upper limit of .1357 and lower limit of .1003. The ratio of total assessed value, $784,800, to true market value, $5,463,494, yields a ratio of .1436%, which exceeds the applied upper limit. Consequently, the calculation for the 2011 tax year is:

$5,463,494    x    .118    =    $644,700 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for the 2011 tax year will be entered as follows:

| Land | $ 67,900 |
| Improvement | $576,800 |
| Total | $644,700 |

For the 2012 tax year, application of the Chapter 123 ratio results in an applied upper limit of .1481 and lower limit of .1095. The ratio of total assessed value, $784,800, to true market value, $5,627,348, yields a ratio of .1395%, which falls between the upper limit and lower limit of the range. Accordingly, no reduction in the subject property's 2012 tax year assessment is warranted.

For the 2013 tax year, application of the Chapter 123 ratio results in an applied upper limit of .1535 and lower limit of .1135. The ratio of total assessed value, $784,800, to true market value, $5,616,819, yields a ratio of .1397%, which falls between the upper limit and lower limit of the range. Accordingly, no reduction in the subject property's 2013 tax year assessment is warranted.

For the 2014 tax year, application of the Chapter 123 ratio results in an applied upper limit of .1596 and lower limit of .1180. The ratio of total assessed value, $784,800, to true market value, $5,798,643, yields a ratio of .1353%, which falls between the upper limit and lower limit of the range. Accordingly, no reduction in the subject property's 2014 tax year assessment is warranted.

For the 2015 tax year, application of the Chapter 123 ratio results in an applied upper limit of .1519 and lower limit of .1123. The ratio of total assessed value, $784,800, to true market value, $5,914,066, yields a ratio of .1327%, which falls between the upper limit and lower limit of the range. Accordingly, no reduction in the subject property's 2015 tax year assessment is warranted.

The court will enter judgments reflecting the foregoing.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.

27